# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANDREW SPLATTSTOESSER AND DEJSHA SPLATTSTOESSER, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF R.S., M.S., AND N.S; DEVIN SPLATTSTOESSER AND NADINE SPLATTSTOESSER, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF R.S; JOSEPH BROWN AND LISA BROWN, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF T.B, A.B., M.B., M.B., AND M.B.; LAWANDA JENKINS AND RASTRICK THOMAS, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF W.J., V.T, A.R., A.R., AND WANDA ALEX; JOSEF HOLBERT, INDIVIDUALLY AND AS NEXT FRIEND OF D.H., L.H., AND A.H.; AND JOE MELVIN-TYSON ULLOTH AND MERLINE ULLOTH, INDIVIDUALLY AND AS NEXT FRIENDS OF J.A.U. AND A.G.U.; AND JOE ULLOTH, JR., <br><br> PLAINTIFFS, <br><br> V. <br><br> FORT SAM HOUSTON FAMILY HOUSING, LP; LINCOLN MILITARY HOUSING LLC; LINCOLN APARTMENT MANAGEMENT LIMITED PARTNERSHIP; LINCOLN BP MANAGEMENT, INC.; LINCOLN PROPERTY COMPANY MANAGEMENT, INC.; LINCOLN PROPERTY COMPANY NO. 2079 LIMITED PARTNERS; LINCOLN NO. 2079, INC.; LINCOLN MILITARY FORT SAM LLC; AETC II PRIVATIZED HOUSING, LLC; AETC II PROPERTY MANAGERS, LLC; AND HUNT ELP, LTD. D/B/A HUNT MILITARY COMMUNITIES, <br><br> DEFENDANTS. | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§ | CASE NO. <u>5:22-CV-00009</u> |

## ORIGINAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Andrew Splattstoesser and Dejsha Splattstoesser, each individually and as next friends of R.S., M.S., and N.S., minor children; Devin Splattstoesser and Nadine Splattstoesser, each individually and as next friends of R.M., minor child;  Joseph Brown and Lisa Brown, each individually and as next friends of T.B, A.B., M.B., M.B., and M.B., minor children; Lawanda Jenkins and Rastrick Thomas, each individually and as next friends of W.J., V.T, A.R., A.R., and Wanda Alex, minor children and dependent adult child; Josef Holbert, individually and as next friend of D.H., L.H., and A.H.; and Joe Melvin-Tyson Ulloth and Merline Ulloth, each individually and as next friends of J.M.U., J.A.U., and A.G.U., bring this Original Complaint and Demand for Jury Trial against the Defendants listed above (collectively the "Landlord Companies," "Housing Defendants," "Lincoln Housing,"  "Lincoln Housing Defendants," "Hunt Housing," or "Hunt Housing Defendants") and allege as follows:

### <u>NATURE OF THE ACTION</u>

1.      This lawsuit is brought by members of the United States Military (with their families) who leased military housing from Lincoln Housing at Fort Sam Houston (the "Military Installation(s)").  In June 2021, the Hunt Housing Defendants assumed the leases, contracts, assets, and role as landlord and property manager for the houses on the Military Installation leased to the Plaintiffs.

2.      As further described below, the Landlord Companies are large, revenue-rich housing companies which were awarded contracts by the federal government to provide quality living arrangements for U.S. service members and their families.  They

2

receive vast amounts of taxpayer revenue and turn massive profits in purporting to do so.

3.      Instead of providing satisfactory housing, the Landlord Companies have for many years concealed harmful housing conditions from unsuspecting military personnel and their families.  The personnel who lease the housing units effectively give up the full amount of their Basic Allowance for Housing ("BAH") only to be placed in housing replete with deplorable living conditions (including, without limitation, HVAC water leaks; various pipe bursts; seeping sewage; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring, ceiling, and walls; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical and HVAC systems; and other unacceptable departures from applicable building and housing codes). In the process, many such military personnel (and their spouses and children) suffer from resulting medical issues such as difficulty breathing, asthma, serious allergic reactions, nose bleeds, and other health issues.  As they observe their families get sicker and sicker and realize the Landlord Companies take no action or grossly inadequate action, they suffer severe and ongoing mental anguish.

4.      When problems with the housing begin arising at points in time after move-in, the Landlord Companies ignore the residents' complaints or provide only token repairs to cover up the extent of the dilapidation.  Thus, the service personnel and their families find themselves in a time-consuming and taxing cycle in which they: (1) must wait on the Landlord Companies to slowly perform maintenance and repairs; (2) come to falsely believe the issues are resolved; and (3) then later discover the issues are not resolved.  All the while, the service personnel and their families suffer the consequences of their contaminated and appalling surroundings.

3

5.     The Landlord Companies routinely over-promise and under-deliver while benefitting from the fact that in many instances they falsely appear to act as if they are the Department of Defense or are under the immediate direction of the Department of Defense.  Thus, military personnel and their families trust Lincoln Housing and Hunt Housing, and they know it and take full advantage by maximizing their profit to the detriment of the military families they have been entrusted by the government to properly care for.

6.     Plaintiffs (collectively referred to as "Servicemembers" or "Servicemember Plaintiffs") in this case assert various claims, including without limitation claims for breach of contract; third-party beneficiary of contract; breaches of the implied warranty of habitability and the implied warranty of good and workmanlike repairs; violations of section 92.051 *et seq.* of the Texas Property Code and the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"); negligence and gross negligence; negligent misrepresentation; statutory fraud and common law fraud; unjust enrichment, restitution, money had & received; and claims for intentional nuisance, negligent nuisance, and strict liability nuisance.

7.     By this lawsuit, the Servicemembers seek to hold the Landlord Companies liable for their false promises, atrocious living conditions, personal injuries, and property damage caused by the Landlord Companies' profound neglect, malfeasance, and greed.

## THE PARTIES

8.     The Servicemember Plaintiffs are military families that have lived in or currently live in privatized housing at the Military Installation(s).

9.     Defendant Fort Sam Houston Family Housing, LP is a Delaware limited partnership that may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

4

10.     Defendant Lincoln Military Housing LLC is a Delaware limited liability company that may be served with process by serving its registered agent at the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

11.     Defendant Lincoln Apartment Management Limited Partnership is a Delaware limited partnership that may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

12.     Defendant Lincoln BP Management, Inc. is a domestic corporation that may be served with process by serving its registered agent CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

13.     Defendant Lincoln Property Company Management, Inc. is a domestic corporation that may be served with process by serving its registered agent CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

14.     Defendant Lincoln Property Company No. 2079 Limited Partners is a domestic limited partnership that may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900 Dallas, Texas 75201.

15.     Defendant Lincoln No. 2079, Inc. is a domestic corporation that may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

16.     Defendant Lincoln Military Fort Sam LLC is a foreign limited liability company that may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

17.     Defendant AETC II Privatized Housing, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

18.     Defendant AETC II Property Managers, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

19.     Defendant Hunt ELP, Ltd., d/b/a Hunt Military Communities is a domestic limited partnership that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

20.     Defendants are each joint tortfeasors, agents of the others, joint venturers, and/or engaged in the joint enterprise of leasing military housing at the Military Installation(s), as well as the conduct and acts and/or omissions alleged herein.  At all times relevant herein, there has existed a unity of interest and ownership among all Defendants, their predecessors, agents, parents and/or subsidiaries, such that any individuality and/or separateness among them has ceased, and each such entity is the alter ego of each other entity.

21.     Based upon information and belief, Defendants AETC II Privatized Housing, LLC, AETC II Property Managers, LLC, and Hunt ELP, Ltd., d/b/a Hunt Military Communities currently control the contracts for military housing at Fort Sam Houston, which were previously managed by Lincoln Housing.

22.     Defendants are not persons acting under a federal officer.

## JURISDICTION AND VENUE

23.     The Servicemembers reallege the above paragraphs as if fully set forth herein.

24.     This Court has federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because some of the Servicemembers' claims arise under laws of the United States,

6

and the Court therefore has ancillary jurisdiction over all of the state-law claims alleged herein.

25.     This Court also has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the Court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267 (1963); *Arlington Hotel Co. v. Fant*, 278 U.S. 439, 455 (1929); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Sparling v. Doyle*, No. EP-12-CV-323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).

26.     The events giving rise to Servicemembers' lawsuit occurred at the Military Installation(s).   Portions of the Military Installation(s) arguably qualify as a federal enclave over which the United States government exercises a degree of federal legislative jurisdiction.  *See* U.S. CONST., art. I, §8, cl. 17; *see also Kelly v. Lockheed Martin S'vcs. Group*, 25 F. Supp. 2d 1, 3 (D. Puerto Rico 1998).  Although the State of Texas retains concurrent jurisdiction over the Military Installation(s) as well, federal courts have subject-matter jurisdiction over controversies arising on federal enclaves.[1]  But the laws of the State of Texas with respect to the housing units at issue are valid and enforceable on the enclave and/or remaining portions of the Military Installation(s).

27.     In determining whether a claim arises on a federal enclave, courts have simply looked to see where "pertinent events" took place. *See Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007) (citing *Snow v. Bechtel Const. Inc.*, 647 F. Supp. 1514, 1521 (C.D. Ca1.1986)). This complaint makes it facially apparent that the pertinent events giving rise to the Servicemembers' claims arise out of their occupancy in housing properties controlled by the Lincoln Housing Defendants on the Military Installation(s).

---

[1] The laws of the State of Texas with respect to the housing units at issue are valid and enforceable at the Military Installation(s) at issue in this suit.

28.     This Court has supplemental jurisdiction for any state law claims under 28 U.S.C. § 1367.

29.     This Court has personal jurisdiction over the Housing Defendants because they have committed the acts complained of herein in this State and in this District.

30.     The Housing Defendants have significant contacts with the Western District of Texas such that they are subject to the personal jurisdiction of this Court.

31.     This Court has personal jurisdiction over the Housing Defendants for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, *inter alia*, regularly conducting and soliciting business in this State and this District, deriving substantial revenue from services provided to persons in this State and this District.

32.     Venue in this proceeding is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Military Installation(s) where the housing at issue is located is within the geographical boundaries of the United States District Court for the Western District of Texas and, as such, a substantial part of the events and/or omissions giving rise to this claim occurred here.

### FACTUAL ALLEGATIONS

### The MHPI and the History of Privatized Military Housing

33.     In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. *See* Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871 *et seq.* (1996). The MHPI provided military service branches with alternative authorities for construction, renovation and management of military housing for families and unaccompanied personnel. Under these authorities, the military services can leverage appropriated housing construction funds and government-owned assets to

attract private capital and private developers so as to improve the quality of life for military members and their families. This legislation provided a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment for the benefit of U.S. servicemembers.

34.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

35.     The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to achieve its purposes, which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

36.     There are about 80 privatized areas encompassing more than 204,000 housing units located on more than 150 installations. The DOD considers these housing units to be private housing.

37.     Servicemembers who lease housing on a particular military base are required to pay the privatized housing company the full amount of their BAH regardless of the size or condition of the house.  Before the MHPI, housing was provided to military personnel in lieu of the BAH. This change created continuous revenue flow for the life of the management contract and, at least conceptually, requires little additional funding from the government.

38.     The privatized housing companies collect "rent" in the form of BAH payments directly from the DOD, leaving servicemembers, including the Servicemembers named as Plaintiffs in this lawsuit, with no control over their BAH and

no leverage against Lincoln Housing when problems arise with their homes. This disparity in bargaining power is further exacerbated by the fact that Lincoln Housing has a direct line of communication with the military and is keenly aware that a single call to the Servicemembers' chain of command will likely stifle any complaints about their housing. Consequently, Lincoln Housing often preys on Servicemembers' fears of reprisal even when conditions within the rental homes merit no BAH payment whatsoever.

39.      Privatizing U.S. military housing was supposed to *protect* soldiers and their families. The military knew hazards lurked in its housing, and the Lincoln Housing likewise were aware of the problems when they took over. In 2005, for example, the U.S. Army released an environmental study showing 75% of its 90,000 homes nationwide did not meet its own standards of quality or safety. Twenty years after privatization, in 2016, a DOD Inspector General Report found that poor maintenance and oversight left military families vulnerable to "pervasive" health and safety hazards.

### Rampant Abuses of the MHPI

40.      Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases around the country, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

41.      Examples of such articles are included below:





42.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

43.     On December 3, 2019, a hearing was held before the United States Senate's Armed Services Committee. At the outset of the hearing, Senator Jim Inhofe stated as follows:

Almost a year ago, **I first heard from military families about the dismal conditions they faced**.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also **all the way around the country**.  And so that was the background of how this all started.

We have come to learn that **it is a problem nationwide**.  It is **a national crisis** of proportions we have not seen since the scandal at Walter Reed about a decade ago.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).[2]

44.     Senator Inhofe further added:

We continue to hear regularly from the **families across the country** about questionable practices, poor workmanship, and frankly, in some places about **housing contractors just not caring** about the families they are supposed to be serving.

Additionally, as reported in the press, some of these contractors are now under investigation for **defrauding the Federal Government**.  I am really worried.  What else can come out of the woodwork on this?  What else don't we know?

. . . .

Regardless of any potential criminal wrongdoing, we are still **receiving complaints on a daily basis** showing that you are still failing to fix this problem.

*Id.* (emphasis added).

45.     During the same Senate hearing, Elizabeth A. Field, a Director with the

Government Accountability Office, testified:

We analyzed over 8 million work order records from all 14 private partners and all 79 projects . . . . we found **anomalies in the data provided by all 14 private partners** such as duplicate work orders and work orders with completion dates prior to when they were submitted.

---

[2] Inhofe's statement can be viewed at https://www.inhofe.senate.gov/newsroom/press-releases/icymi-inhofe-delivers-opening-remarks-at-privatized-military-housing-hearing.

*See* TESTIMONY BEFORE SENATE ARMED SERVICES COMMITTEE at 14:10-14:20 (emphasis added).[3]

46.      Field then added:

**The problems I detail are significant** . . . . because the Department has been using these metrics to reward and incentivize the private partners.

*See id.* (emphasis added).

47.      Private military housing companies, including the Lincoln Housing Defendants in this case, upon information and belief manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees," that could be collected as part of its contract with the government.

48.      On February 6, 2019, Senator Elizabeth Warren opened her own investigation of the MHPI and private military housing Lincoln Housing operated thereunder.  In Senate testimony on February 13, 2019, John Ehle, President of Hunt Military Communities, acknowledged Defendants and/or related entities are responsible for the maintenance of the military housing on applicable bases and effectively admitted under oath that they have not met their obligations to ensure the military housing under their charge are safe, clean and habitable.  *See, e.g.,* TESTIMONY BEFORE JOINT SUBCOMMITTEE ON PERSONNEL & READINESS AND MANAGEMENT SUPPORT at 2:21:20-2:21:26.[4]  The leaders of other housing entities operating under the MHPI echoed the same with respect to their standards and procedures and, as a result, amplified widespread concern about a culture of systemic abuse that appears to be rampant throughout the

---

[3] Ms. Fields' testimony is available at https://www.c-span.org/video/?466935-1/privatized-military-housing (last visited Nov. 18, 2021).

[4] The hearing testimony is available at https://www.armed-services.senate.gov/hearings/19-02-13-current-condition-of-the-military-housing-privatization-initiative (last visited Nov. 18, 2021).

housing companies operating under the MHPI (including the Lincoln Housing Defendants named herein). *See id.*

49. The Landlord Companies were tasked with providing quality military housing to U.S. military personnel and their families but, upon information and belief, have operated duplicitously so as to avoid doing so and thereby decrease costs while increasing profits at the expense of U.S. soldiers, their families and children, and the United States taxpayer.

50. Senator Warren submitted her written report, dated April 30, 2019, which contained four conclusions about the various private housing firms operating under the MHPI, including the Lincoln Housing named as Defendants herein: (1) they have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) they have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) they are making large profits while taking minimal investment risks; and (4) they are receiving sizeable incentive fees even when they face substantial quality control challenges. *See* REPORT OF INVESTIGATION INTO MHPI, Apr. 30, 2019.[5]

51. Since having ownership of the subject housing units at the Military Installation(s) transferred to them and being delegated maintenance responsibility for the same, Lincoln Housing and Hunt Housing have systematically undermaintained the

---

[5] Senator Warren's report is available at
https://www.warren.senate.gov/imo/media/doc/2019.04.30%20Military%20Housing%20Letter%20to%20Armed%20Services%20Branch%20Chiefs.pdf (last visited Nov. 18, 2021).

units, subjecting the Servicemembers and their families to the above-described atrocious conditions.

52.     In their dealings with the Servicemembers, but for the admissions and acknowledgements in their congressional testimony, Lincoln Housing and Hunt Housing refuse to acknowledge the severity of the problems and refuse to adequately remedy them, instead moving families again and again and again to new units they assure the Servicemembers are just fine.

53.     As a result, the Servicemembers and their families have fallen ill due to exposure to the mold and other toxins, lost nearly all their personal possessions (some as a result of living in multiple units with environmental issues), and paid their full BAH in exchange for woefully substandard facilities.

**The Servicemembers and Their Families Have Suffered Tremendously**

**THE SPLATTSTOESSER FAMILY**

54.     Andrew Splattstoesser, his wife, Dejsha Splattstoesser, their three minor children, their adult son, Devin Splattstoesser, Devin's wife, Nadine Splattstoesser, and Devin and Nadine's minor daughter, moved to Lincoln-managed on-base housing at Fort Sam Houston in May 2017.  The dilapidated, unhealthy, and destructive conditions they encountered continued to plague them until the day the family left.

55.     The Splattstoesser family moved into the house located at 3983 Bondsteel Circle, San Antonio, TX 78234 on May 10, 2017.  During the time that the Splattstoesser family lived in that home, they experienced issues related to water damage, mold growth, structural deficiencies, sewage complications, electrical problems, and rodent infestations.

56.     Despite being aware of these issues at the houses at Fort Sam Houston, Lincoln Housing leased the house to the Splattstoesser family without revealing the

profound defects and safety risks associated with the house. The Splattstoesser family relied to their detriment on Lincoln Housing's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

57.    Then, after the lease was signed, severe problems within the house arose. Specifically, multiple HVAC water leaks into different areas of the house, water damage in the walls and floors, toxic mold in the HVAC ducts, bathrooms, kitchen, and bedrooms.

58.    Throughout their tenancy, the Splattstoesser family was forced to deal with faulty electrical wiring that sparked and damaged appliances, an insect and rodent infestation throughout the entirety of the house, such as weevils infesting the couches and cockroaches in the kitchen. The Splattstoesser family had to abandon some of their personal property deemed damaged or unusable due to the conditions in the home. Lincoln Housing continued to mislead the Splattstoesser family by representing that Lincoln Housing was performing adequate repairs when Lincoln Housing did not. For example, there are layers of paint where the tenants were told the mold was cleaned off but instead was just painted over within the home, not fixing the problem but further covering it up. Lincoln Housing's repairs were often merely band-aids that concealed larger problems and failed to remedy underlying issues.

59.    Lincoln Housing's neglect also gave rise to a more serious problem: the Splattstoesser family's health suffered as a result of living in the contaminated house. Andrew and Dejsha Splattstoesser experienced breathing problems, both developed asthma, and allergies resulting in Andrew undergoing 16 weeks of allergy shots. One of their daughters experienced severe allergies and had to regularly visit an allergy specialist. The other Splattstoesser family members had flu-like symptoms, asthma, and continuing breathing issues. All family members were seen by a medical professional

after experiencing the above-listed adverse health effects. These health problems continue to this day.  Without question, the Splattstoesser family would never have entered into a lease with Lincoln Housing had they known at the start that Lincoln Housing was leasing to them a house it knew was unsafe.

60.     Because Lincoln Housing concealed the truth about their housing and then failed to remediate problems that materially affected physical health and safety, the Splattstoesser family suffered property damages, unnecessary expenses, profound health issues, potential career setbacks, and mental anguish and distress worrying about their children, careers, and how to deal with their contaminated personal property.  Again and again, the Splattstoesser family notified Lincoln Housing of potentially dangerous conditions at their house, to no avail.  Lincoln Housing continually assured the Splattstoesser family that work was performed and that the house was safe when Lincoln Housing knew that was not true.

61.     The Splattstoesser family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damage, which will grow with the inclusion of medical costs, both past and future, and with the evaluation of costs to repair, replace, or remediate personal property.  The Splattstoesser family have suffered mental anguish damages due to Lincoln Housing placing them in an uninhabitable house that made them sick.  They suffered from concerns about their family's safety and anxiety over how to escape their house without disrupting their lives and medically necessary treatments or incurring tremendous costs from moving, personal property replacement, and off-base housing.

### THE BROWN FAMILY

62.     Joseph Brown, his wife, Lisa Brown, and their five children (collectively referred to in this section as the "Brown family") moved to Lincoln-managed on-base

housing at Fort Sam Houston in October 2016. The unhealthy and unlivable conditions they encountered continued to plague them throughout their tenancy with Lincoln Housing.

63.     The Brown family moved into 3968 Decker Circle, Fort Sam Houston, TX 78234 on October 1, 2016.  Despite being aware of persistent water intrusion and damage, insect infestation, mold infiltration, asbestos, lead paint, and structural issues at the houses at Fort Sam Houston, Lincoln Housing leased the house to the Brown family without revealing the profound defects and safety risks associated with the house.  The Brown family relied to their detriment on Lincoln Housing's materially false and misleading representations that their house was safe, habitable, and adequately repaired. Then, after the lease was signed, severe problems within the house started to arise: multiple HVAC water leaks into different areas of the house, toxic mold in the HVAC ducts, bathrooms, garage, and bedrooms, and structural issues.

64.     Throughout their tenancy, the Brown family was forced to deal with insect infestations, birds nesting in the walls, various pipe bursts, and unsafe structural damage, such as a sagging bedroom ceiling. Lincoln Housing continued to mislead the Brown family by representing that Lincoln Housing was performing adequate repairs when Lincoln Housing did not. For example, there are 25 layers of paint where the tenants were told the mold was cleaned but instead was just painted over within the home, not fixing the problem but further covering it up. The Brown family had to abandon some of their personal property deemed damaged or unusable due to the conditions in the home. Additionally, the Brown family was displaced from their house because of its unsafe condition on multiple occasions.  Lincoln Housing's repairs were often merely band-aids that concealed larger problems and failed to remedy underlying issues.

65.     Lincoln Housing's neglect also gave rise to a more serious problem: the Brown family's health suffered as a result of living in the contaminated house.  Joseph and Lisa Brown experienced breathing problems. Their oldest daughter experienced excessive and constant nose bleeds that resulted in her being rushed from her school to the hospital and further being diagnosed with rare allergy symptoms she never experienced prior to moving into the home. Their infant child at 2-3 months old had to undergo a spinal tap and was hospitalized with a fever over 101 degrees. The entire Brown family had severe pneumonia-like symptoms, with the oldest child experiencing pneumonia more than once while residing in the house.  All the Brown family members were seen by a medical professional after experiencing the above-listed adverse health effects. These health problems continue to this day.  Without question, the Brown family would never have entered into a lease with Lincoln Housing had they known at the start that Lincoln Housing was leasing them a house it knew was unsafe.

66.     As a result of living in a Lincoln-Managed house at Fort Sam Houston for a year, the Brown family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins. The deplorable conditions in the home also caused them to suffer mental distress from living in an unhealthy environment, worrying about their family's health, dealing with a landlord that consistently failed to address issues that materially affected their health and safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.  The Brown family has sustained economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property.

### THE JENKINS FAMILY

67.    Lawanda Jenkins and Rastrick Thomas, along with their four minor children and adult dependent, Wanda Alex (collectively referred to in this section as the "Jenkins family"), moved to Lincoln-managed on-base housing at Fort Sam Houston in January 2014. During their time in the property, the Jenkins family faced water intrusion and damage, insect infestation, mold infiltration, water damage, sewage problems, and structural issues.

68.    The Jenkins family moved into 5673 Johnston Circle, San Antonio, TX 78234 on January 14, 2014.  Despite being aware of persistent water intrusion and damage, insect infestation, mold infiltration, water damage, sewage problems, and structural issues at the houses at Fort Sam Houston, Lincoln Housing leased the house to the Jenkins family without revealing the profound defects and safety risks associated with the house. The Jenkins family relied to their detriment on Lincoln Housing's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

69.    Within a few months after moving in, the Jenkins family began to experience severe problems within the house including faulty air conditioning, multiple HVAC water leaks into different areas of the house resulting in water damage, sewage backup, and toxic mold in the HVAC ducts. Throughout their tenancy, the Jenkins family was forced to deal with an insect problem, the whole house flooding which led to carpet damage and caused further mold growth, and unsafe structural damage from water damage. Lincoln Housing continued to mislead the Jenkins family by representing that Lincoln Housing was performing adequate repairs when Lincoln Housing did not. For example, Lincoln Housing told the Jenkins family the mold was remediated, but only repainted over the walls, not fixing problem but further covering it up. Again and again, the Jenkins family notified Lincoln Housing of potentially dangerous conditions at their

house, to no avail.  Lincoln Housing continually assured the Jenkins family that work was performed and that the house was safe when Lincoln Housing knew that was not true.

70.    The Jenkins family also suffered health problems from living in the contaminated house as a result of Lincoln Housing's neglect. Lawanda Jenkins was diagnosed with asthma after moving into the house.  In fact, Ms. Jenkins' asthma is so advanced that she was medically retired from the military. Wanda and three of the Jenkins' minor children experienced extreme difficulties breathing and now require inhalers. One of their daughters has special needs and experienced difficulty breathing resulting in surgery in hopes of resolving her symptoms. All family members were seen by a medical professional after experiencing the above-listed adverse health effects. These health problems continue to this day.  Without question, the Jenkins family would never have entered into a lease with Lincoln Housing had they known at the start that Lincoln Housing was leasing them a house it knew was unsafe.

71.    Because Lincoln Housing concealed the truth about their housing and then failed to remediate problems that materially affected the physical health and safety of the Jenkins family, the Jenkins family suffered property damages, unnecessary expenses, profound health issues, career setbacks that resulted in early medical retirement for Lawanda Jenkins, and mental anguish and distress worrying about their children, careers, and how to deal with their contaminated personal property. As a result of living in a Lincoln-managed house at Fort Sam Houston for several years, the Jenkins family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins. The Jenkins family has sustained economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property.

**THE HOLBERT FAMILY**

72.     Josef Holbert and his three minor children moved to Lincoln-managed on-base housing at Fort Sam Houston in October 2017.  The dilapidated, unhealthy, and destructive conditions they encountered continued to plague them until the day the family left.

73.     The Holbert family moved into the house located at 3966 Decker Circle, San Antonio, TX 78234 on October 16, 2017 and moved out on November 6, 2021.  During the time that the Holbert family lived in that home, they experienced issues related to water damage, mold growth, structural deficiencies, sewage complications, rodent and insect infestations, and asbestos.

74.     Despite being aware of these issues at the houses at Fort Sam Houston, Lincoln Housing leased the house to the Holbert family without revealing the profound defects and safety risks associated with the house. The Holbert family relied to their detriment on Lincoln Housing's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

75.     Then, after the lease was signed, severe problems within the house arose. Specifically, bathroom plumbing leaks were not properly repaired, water pipes throughout the home backed up requiring shutting the water off to the entire home, sewage backed up into the bathtubs, water damage in the walls and floors, toxic mold grew in the HVAC ducts, bathrooms, kitchen, and bedrooms. The problems in the home forced the Holbert family to be displaced from their residence for several weeks in 2018, uprooting their lives and causing additional stress.

76.     Throughout their tenancy, the Holbert family was forced to deal with faulty plumbing, sewage backup, water leaks, toxic mold, unsafe flooring, and insect and rodent

infestations. The Holbert family had to abandon and/or remediate most of their personal property deemed damaged or unusable due to the conditions in the home. Lincoln Housing (and Hunt Housing once they took on the role as landlord and property manager) continued to mislead the Holbert family by representing that the Housing Defendants were performing adequate repairs when they did not. For example, the Housing Defendants told the Holbert family they had repaired water leaks in the downstairs bathroom, but the leak continued within the walls, damaging the drywall and resulting in mold. Although the Housing Defendants were aware of the continued plumbing leaks, they never fully repaired and remediated the issue. The Housing Defendants' repairs were often merely band-aids that concealed larger problems and failed to remedy underlying issues.

77.    The Housing Defendants' neglect also gave rise to a more serious problem: the Holbert family's health suffered as a result of living in the contaminated house. Every member of their family developed asthma while living in the home. Additionally, one of Mr. Holbert's daughters suffered from skin rashes and excessively sensitive skin as a result of the living conditions in the home. All family members were seen by a medical professional after experiencing the above-listed adverse health effects. These health problems continue to this day. Without question, the Holbert family would never have entered into a lease with the Housing Defendants had they known at the start that the Housing Defendants were leasing to them a house they knew was unsafe.

78.    Because the Housing Defendants concealed the truth about their housing and then failed to remediate problems that materially affected physical health and safety, the Holbert family suffered property damages, unnecessary expenses, profound health issues, potential career setbacks, and mental anguish and distress worrying about their well-being, careers, and how to deal with their contaminated personal property. Again

and again, the Holbert family notified the Housing Defendants of potentially dangerous conditions at their house, to no avail.  The Housing Defendants continually assured the Holbert family that work was performed and that the house was safe when the Housing Defendants knew that was not true.

79.    The Holbert family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damage, which will grow with the inclusion of medical costs, both past and future, and with the evaluation of costs to repair, replace, or remediate personal property. The Holbert family have suffered mental anguish damages due to the Housing Defendants placing them in an uninhabitable house that made them sick.  They suffered from concerns about their family's safety and anxiety over how to escape their house without disrupting their lives and medically necessary treatments or incurring tremendous costs from moving, personal property replacement, and off-base housing.

### THE ULLOTH FAMILY

80.    Joe and Merline Ulloth and their three children moved to Lincoln-managed on-base housing at Fort Sam Houston in November 2019.  The dilapidated, unhealthy, and destructive conditions they encountered continued to plague them until the day the family left.

81.    The Ulloth family moved into the house located at 14 Staff Post Road, San Antonio, Texas 78234 on November 4, 2019.  During the time that the Ulloth family lived in that home, they experienced issues related to water damage, mold growth, asbestos, structural deficiencies, and rodent and insect infestations.

82.    Despite being aware of these issues at the houses at Fort Sam Houston, Lincoln Housing leased the house to the Ulloth family without revealing the profound

24

defects and safety risks associated with the house. The Ulloth family relied to their detriment on Lincoln Housing's materially false and misleading representations that their house was safe, habitable, and adequately repaired.

83. Then, after the lease was signed, severe problems within the house arose. Throughout their tenancy, the Ulloth family was forced to deal with water leaks in their laundry room, bathroom, and kitchen, which resulted in water leaking into the basement, causing water damage in the affected areas of the house. The leaks caused further mold growth in the kitchen, garage, a connected unit to the main house, and bathroom, which was eventually padlocked as it was completely uninhabitable. Rather than addressing the root of the water leaks, Lincoln Housing's maintenance would merely come back to the home each time and restretch the vinyl flooring in the affected areas. Additionally, the HVAC system was not sealed nor in place, causing the Ulloth family to breathe in toxic air from the mold throughout the house and the asbestos in the attic. Squirrels took up residence in the Ulloth's attic, disturbing the asbestos fibers and allowing the HVAC system to circulate asbestos throughout the home. Further, the Ulloth family experienced three gas leaks resulting from a rusty pipe beneath the house. During one of those gas leaks, Mrs. Ulloth fell down a flight of stairs in the home due to the dizziness caused by inhaling gas. The concealment and failure to remedy the problems caused the Ulloths to be displaced from their home from December 19-24, 2019, as their health, safety, and family life were severely affected.

84. During this period of displacement, the Ulloths were faced with the option to move into another home owned by Lincoln Housing or to pay for a hotel at the Ulloth's expense. With their children as the focus, Mr. and Mrs. Ulloth chose the other Lincoln-owned home as to not further upset their children's educational routines. Upon moving

into the second home, the Ulloths immediately noticed a cockroach infestation throughout the house. After becoming aware of the infestation, the Ulloths did not want to experience additional health symptoms. Therefore, they decided to take on the financial expense of moving themselves into a hotel until they could move back into their home.

85.     Lincoln Housing continued to mislead the Ulloths by representing that Lincoln Housing was performing adequate repairs when Lincoln Housing was not. For example, Lincoln Housing told the Ulloth family the leak in the kitchen was remediated when in fact it only restretched the vinyl flooring that was affected by the leak. This did not solve the problem, but rather further concealed the issue. Lincoln Housing's repairs were often merely band-aids that concealed larger problems and failed to remedy underlying issues.

86.     Lincoln Housing's neglect also gave rise to a more serious problem: the Ulloth family's health suffered as a result of living in the contaminated house.  Merline Ulloth experienced excessive fatigue, critically low oxygen hemoglobin levels, migraines, chest palpitations, irritation to eyes and throat, memory impairment, insomnia, persistent dry cough, vomiting, and copious other symptoms. Mrs. Ulloth visited over ten doctors to address her health problems. Upon moving into the house, Mr. Ulloth had migraines, sleep apnea, insomnia, and increased joint pains. One of their children experienced migraines, increased menstrual bleeding, chest pains, depressed mood, fatigue, and trouble sleeping. Another of their children experienced gastrointestinal problems, unexplained weight loss, chronic abdominal pain, anxiety, and sleep disturbance. Additionally, Joe Ulloth, Jr. also experienced gastrointestinal problems, nausea, fatigue, chest pain, and mental trauma. These health problems continue to this day.  Without

question, the Ulloth family would never have entered into a lease with Lincoln Housing had they known at the start that Lincoln Housing was leasing to them a house it knew was unsafe.

87.    Because Lincoln Housing concealed the truth about their housing and then failed to remediate problems that materially affected physical health and safety, the Ulloth family suffered property damages, unnecessary expenses, profound health issues, potential career setbacks, and mental anguish and distress worrying about their well-being, careers, and how to deal with their contaminated personal property.  Again and again, the Ulloth family notified Lincoln Housing of potentially dangerous conditions at their house, to no avail.  Lincoln Housing continually assured the Ulloth family that work was performed and that the house was safe when Lincoln Housing knew that was not true.

88.    The Ulloth family suffered economic damages consisting of their Basic Allowance for Housing, elevated utility bills, repair bills, medical bills, and personal property damage, which will grow with the inclusion of medical costs, both past and future, and with the evaluation of costs to repair, replace, or remediate personal property. The Ulloth family have suffered mental anguish damages due to Lincoln Housing placing them in an uninhabitable house that made them sick.  They suffered from concerns about their family's safety and anxiety over how to escape their house without disrupting their lives and medically necessary treatments or incurring tremendous costs from moving, personal property replacement, and off-base housing.

## THE COMMON THEME

89.    With respect to all of these families, on the day each family first saw and leased their respective house from Lincoln Housing, Lincoln Housing's representatives

told the families that the house being leased to them was safe for them to occupy and had no unresolved issues, and each of the families believed this to be true. These communications occurred at the Lincoln Housing office on Fort Sam Houston. Thereafter, throughout their time in the houses, whenever a family would call in, email in, or otherwise submit a work order, Lincoln Housing's representatives would tell the families – either at the house or at the housing office – that all work necessary to resolve the issue had been performed. These representations were demonstrably false, as the issues complained of continued to persist throughout each family's occupancy of the house leased to them, and as further investigation has revealed that the houses had long-standing maintenance issues. The names, dates, and issues that are the subject of the false representations are documented in the work order history maintained by the Lincoln Housing Defendants.

### The Underlying Contracts, Military Services' Standards, and Servicemember Leases

90.     Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities in return for their provision of housing and related services to military personnel. *See* 141 Cong. Rec. S18853 (noting the MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel.").

91.     According to the website for the Office of the Assistant Secretary of Defense for Sustainment, Congress established the MHPI "as a tool to help the military improve the quality of life for its servicemembers by improving the condition of their housing."[6]

---

[6] *See* Office of the Assistant Secretary of Defense for Sustainment, Facilities Management–Military Housing Privatization Initiative, *available at* https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html.

92. After the MHPI was enacted into law, the United States of America—to accomplish its admirable goals related to the improvement and management of military housing—entered into a ground lease and various other contracts (the "Underlying Contracts") binding the Lincoln Housing Defendants for the design, development, management, operation, maintenance, renovation and rehabilitation of housing units for military personnel and their families at the Military Installation(s).[7] On Information and belief, Hunt Housing assumed those contracts and obligations In June 2021.

93. Accordingly, military personnel such as the Servicemember Plaintiffs in this lawsuit were intended beneficiaries of the MHPI and the Underlying Contracts which served as the primary vehicle for implementation of the MHPI. The MHPI and the Underlying Contracts were created for the express purpose of improving military housing for military personnel and their families including the Servicemember Plaintiffs in this lawsuit.

94. As a result of the Underlying Contracts binding the lessee signatories and their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like, the Lincoln Housing Defendants placed themselves in such a relationship with the Servicemembers that the law imposes an obligation upon the Lincoln Housing Defendants to act in such a way that the Servicemember Plaintiffs in this lawsuit would not be injured as a result of leasing the privatized housing units. The holds true for Hunt Housing by virtue of their assumption of the Underlying Contracts.

95. The Underlying Contracts require compliance with applicable state laws. As revealed by congressional testimony in December of 2019 by Elizabeth A. Field, a Director with the Government Accountability Office, the Lincoln Housing Defendants

---

[7] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

must "comply with all federal, state, and local environmental health and safety codes. . . . [T]hat requirement is in all of the contracts."[8]

96.     Moreover, the Underlying Contracts, upon information and belief, require management and maintenance of the military housing consistent with the standards of a market rate residential rental development in the surrounding area.  This is to include maintenance and repair in accordance with military, federal, state and local codes to ensure all of the houses are at all times maintained in a reasonably acceptable fashion.

97.     In addition, all new construction and major renovations at military housing projects must be completed in accordance with local building codes and standards.

98.     And the military services have adopted their own standards applying to the condition and maintenance of privatized housing.  Compliance with the standards is generally mandatory.

99.     For example, Army Pamphlet 420-1-1 identifies standards intended to maintain housing to prevent its deterioration including, without limitation, as follows: roofing is required to be weather-tight and free of corrosion and abnormal deterioration of individual components, and replacement is required for missing pieces to preserve the original whole condition of the roof system; items which pierce the roofing must function as originally designed; flashing must prevent leaks as originally intended; interior walls must be free of damage, deterioration, cracks or defective materials; subflooring and related structural members must be safe and usable; deteriorated subflooring must be

_____

[8] *See* Transcript of December 3, 2019 Hearing Before the Committee on Armed Services of the United States Senate, *available at* https://www.armed-services.senate.gov/imo/media/doc/19-77_12-03-19.pdf, at p. 89:7-10.

repaired or replaced to retain the original condition of the floor; and interior trim must be smooth and free of chipped and peeling paint.[9]

100.     Similarly, pursuant to the Air Force Guidance Memorandum AFI32-6001, maintenance and repair must be performed according to accepted engineering practices and repairs to defective, broken, damaged or malfunctioning conditions must be performed timely and adequately, including without limitation interior painting; minor floor and wall repairs; restoring ceiling and wall finishes; electrical and plumbing fixture repairs; restoration or replacement of flooring and roofing systems as needed; repair of exterior walls and structures; repair of interior partitions; repair of electrical, plumbing, heating ventilations and air conditioning; and replacing failed or unserviceable materials, systems or components.[10]  Under the U.S. Air Force Family Housing Guide for Planning, Programming, Design and Construction, lead-based paint must be abated and indoor air pollutants such as mold, asbestos and harmful allergens must be eliminated.[11]

101.     Moreover, the Underlying Contracts, upon information and belief, require Lincoln Housing and Hunt Housing to manage lead-based paint in accordance with standards set by the military services, and an environmental baseline survey must be prepared before any real property can be sold, leased, transferred or acquired so as to establish a baseline of the environmental condition of the housing and serve as a basis for identifying areas that may be contaminated.  The survey, upon information and belief, includes a lead-based paint survey indicating the presence of lead-based paint in the housing units constructed prior to 1978, and in some instances in the soil surrounding

---

[9] *See* ARMY PAMPHLET 420-1-1, pp. 49-51, *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/PAM%20420-1-1.pdf.

[10] *See* AIR FORCE GUIDANCE MEMORANDUM AFI32-6001, pp. 57-58, *available at* https://www.wbdg.org/FFC/AF/AFI/afi_32_6001.pdf.

[11] *See* U.S. AIR FORCE FAMILY HOUSING GUIDE FOR PLANNING, PROGRAMMING, DESIGN AND CONSTRUCTION, pp. 211-14, *available at* https://www.wbdg.org/FFC/AF/AFDG/familyhousing.pdf.

the units which exceeds regulations set by the Environmental Protection Agency ("EPA").  Pursuant to  EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million in high contact areas for children or 1,200 parts per million of bare soil in the rest of the yard.  And, according to the baseline survey, lead-based paint exists throughout the housing units including without limitation door frames, window sills, window jambs, and baseboards. Accordingly, Lincoln Housing and Hunt Housing possessed records and information, upon information and belief, including the aforementioned environmental survey which identified concerning lead concentrations in the soil surrounding the housing units as well as in the lead-based paint present in the housing units, but did not disclose such information to all tenants as required and have failed to remedy the conditions, thereby exposing the Servicemembers and their families thereto.

102.    Upon information and belief, Lincoln Housing and Hunt Housing knew about the unacceptable conditions in the housing when they agreed in the Underlying Contracts to manage the housing and ensure it was made habitable and acceptable for military members and their families to live in the houses.  Moreover, upon information and belief, Lincoln Housing and Hunt Housing agreed they would not permit occupancy or use of any buildings, including those leased by the Servicemembers, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards.

103.    Lincoln Housing and Hunt Housing require Servicemembers to enter into a lease agreement.  Under the terms of the lease, Servicemembers' rent is the full BAH, which is deposited directly into Lincoln Housing's accounts. Despite the deplorable conditions described herein, there is no ability for Servicemembers to negotiate the price of the housing.

104.    For a Servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

105.    To this point, Senator Tim Kaine remarked on December 3, 2019, during the hearing before the United States Senate's Armed Services Committee:

> But **they treat military tenants like they are captives**, like it is a captive audience.  People who move from across the country to a place where they do not know anyone, where they do not know anything about the rental market, where they are trying to find new schools and get accustomed to everything else – there is a natural tendency to want to live on base.  And the occupancy rates will be high because of that tendency.  And **so these companies who would compete hard and try to produce a high quality product in another business** unit of the identical company **treat these folks as if they are captives** and that they do not have to treat them in the same way that they would treat private tenants.  And I find that outrageous.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).

106.    The lease is made subject to the laws of the State of Texas, and Lincoln Housing and Hunt Housing provide Servicemembers with resident guide(s) incorporated into the lease which upon information and belief convey rules and regulations subject to the laws of the State of Texas.

107.    The Lincoln Housing and Hunt Housing Defendants have, upon information and belief, received thousands of complaints and repair requests, including those from the Servicemembers named as Plaintiffs herein, evidencing serious defects which exist throughout the housing units.  Lincoln Housing and Hunt Housing had

actual notice of the unfit and uninhabitable state of leased premises but failed to adequately make repairs.

108.    Instead, upon information and belief, Lincoln Housing and Hunt Housing made representations to Servicemembers in connection with the lease, including that the houses were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability. Specifically, Lincoln Housing advertised to the Servicemembers that: "At Lincoln Military Housing, our mission is to provide military families with exemplary service in a quality home environment…" and "as owners and managers of one of the largest multi-family real estate portfolios in the Unites States, Lincoln Property Company has assembled a group of seasoned professionals who pursue a sophisticated approach to property development and management.".[12] Such statements led the Servicemembers to believe that they were renting a home that was safe for their family and not harmful to their health.

109.    Nevertheless, the fact remains that the Servicemembers' experiences run overwhelmingly contrary to the Lincoln Housing' false representations.

## CAUSES OF ACTION

110.    The Servicemembers reallege and incorporate by reference the foregoing paragraphs as though fully stated herein.

## Count 1 – Breach of Contract

111.    The Servicemembers assert claims against the Landlord Companies for breach of the particular lease agreement ("Lease") to which Lincoln Housing and each of the Servicemembers are parties.  To the extent the Lease or ensuing obligations were assumed by Hunt Housing, the claims are asserted against Hunt Housing.

---

[12] Lincoln Housing website as of May 19, 2021, https://lincolnmilitary.com/who-we-are/management/ and https://lincolnmilitary.com/who-we-are/mission-standards/.

112.    Pursuant to Texas law, implicit in the Lease and/or as expressly represented therein is the warranty that the Landlord Companies were leasing houses to Servicemembers which were fit for human habitation and not replete with deplorable living conditions (including, without limitation, HVAC water leaks; various pipe bursts; seeping sewage; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring, ceiling, and walls; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical and HVAC systems; and other unacceptable departures from applicable building and housing codes).

113.    To date, the Landlord Companies have failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth above in more detail. As such, the Landlord Companies have materially breached their leases with Servicemembers, causing them to suffer actual damages.

114.    Because of the Landlord Companies' breaches, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

## Count 2 – Violations of the Texas Deceptive Trade Practices-Consumer Protection Act

115.    Pleading further, and in the alternative to the extent necessary, the Servicemembers are consumers as defined by the DTPA, as they sought to acquire goods and services by lease — namely a habitable, properly-maintained residence from the Landlord Companies.  The Landlord Companies are proper defendants under the DTPA.

116.   The Landlord Companies, in the course of leasing residences to the Servicemembers, violated the DTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability;[13] (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

a.   causing confusion or misunderstanding about affiliation, connection, or association with, or certification by, another;

b.   causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

c.   representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

d.   representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

e.   representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

f.   knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

g.   representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;

h.   representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and

i.   failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[14]

---

[13] The Texas Supreme Court has recognized that, in a residential lease, the landlord impliedly warrants that the property is habitable and fit for human living as of the beginning of the lease and that such condition will remain in effect throughout the lease. *Kamarath v. Bennett*, 568 S.W.2d 658, 660-61 (Tex. 1978).
[14] *See* TEX. BUS. & COM. CODE §§ 17.46(b)(2), (3), (5), (7), (12), (13), (20), (22), (24).

36

117.    Specifically, the Landlord Companies, by virtue of their course of administering, leasing, building, and repairing the housing units at issue, were uniquely aware of the condition of the houses, including without limitation the existence of mold, asbestos, rodent and/or insect infestations, and the electrical, plumbing, and HVAC issues associated with the housing units they manage. Nevertheless, the Landlord Companies knowingly and intentionally leased houses to Servicemembers, necessarily and as a matter of fact representing to Servicemembers that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

118.    The Landlord Companies' knowing and intentional representations to Servicemembers were materially false and misleading. Servicemembers relied to their detriment on the representations of the Landlord Companies in entering into the leases. However, the Servicemembers have discovered the houses were uninhabitable and not safe for human occupancy and have suffered medical issues as a result of occupying the houses. The Servicemembers have further discovered the Landlord Companies misled them into believing the houses had been properly maintained, and that the repair and remedy work Servicemembers requested during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner so as to fully remedy the complained-of issues. Had Servicemembers had an opportunity to properly inspect the houses leased to them, and had the Landlord Companies disclosed the true nature of the damage to the houses, none of the Servicemembers would have entered into the respective leases.

119.    the Landlord Companies also misrepresented and caused confusion about the source, sponsorship, approval, and/or certification of goods or services. One way the Landlord Companies did this was through knowingly and intentionally misleading

Servicemembers into believing, through their email signature lines, that their own employees are part of the Department of Defense or otherwise overtly affiliated with and/or acting under the immediate direction of the military.

120.   In reality, each of the houses leased to the Servicemembers suffers from such extreme deterioration and mold-related damage and infestation, such that the houses are not safe for human habitation. Mold pervades and grows in the houses. The moisture content of walls contributes to the ever-present moldy conditions, and without repair will only continue to get worse. HVAC systems leak as well and flood the houses. Rodents and insects pervade the walls and, in many cases, the living spaces.  In short, the Landlord Companies knowingly and intentionally leased Servicemembers' houses which were uninhabitable from the inception of the lease and the Landlord Companies subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

121.   Moreover, the Landlord Companies utilized their relationship with the military, Servicemembers' status within the military, Servicemembers' relatively weaker economic position, the availability (or sometimes lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold Servicemembers hostage in their leases until they received orders stationing them elsewhere. Meanwhile, the Landlord Companies obtained the full amount of Servicemembers' BAH directly from the federal government, giving Servicemembers no discount for the size, quality, or condition of their house, nor for the substandard and deceptive performance of periodic and requested maintenance.

122.   The Landlord Companies' above-described knowing and intentional conduct in subjecting the Servicemembers to uninhabitable living conditions has been and remains a producing cause of economic damages, including without limitation, loss

of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Servicemembers and their family members have suffered mental anguish damages as a result of the Landlord Companies' conduct in knowingly and intentionally placing them in uninhabitable housing units, with such mental anguish many times manifesting itself in physical symptoms associated with the conditions in which the Servicemembers were forced to live. The Servicemembers have also suffered mental anguish through concerns about their family members' wellbeing (as well as their own), their concerns about how and whether they could afford to escape those conditions, concerns about finding suitable housing, concerns about replacing personal property, and sorrow over the loss of priceless and/or irreplaceable family heirlooms and records.

123.    The Landlord Companies' knowing and intentional acts and/or omissions as described herein were committed with actual awareness of the falsity, deception, or unfairness of an act or practice, or of a condition or defect that constitutes a breach of warranty, and with the specific intent of having the Servicemembers act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

124.    As a result of the Landlord Companies' conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs as authorized by section 17.50 of the DTPA.

### Count 3 – Breach of Implied Warranty of Habitability, Breach of Implied Warranty of Good and Workmanlike Repairs, and Violations of Section 92.051 *et seq.* of the Texas Property Code

125.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for breaching the implied

warranties of habitability and good and workmanlike repairs, and for violating the Texas Property Code, including but not limited to section 92.051 *et seq.*, and specifically Section 92.052  Servicemembers have, in accordance with their leases and chapter 92 of the Texas Property Code, given the Landlord Companies notice of the myriad of issues identified herein associated with the houses each family has leased from the Landlord Companies. Nevertheless, the Landlord Companies knowingly and intentionally failed to repair defects (and/or to make such repairs in a good and workmanlike manner) and to make each house habitable for human occupation. To date, the housing units leased by Servicemembers suffer from pervasive mold and other conditions which materially affect the health and safety of occupants. The Landlord Companies have had adequate time to repair and/or remedy the unsafe and unsanitary conditions after Servicemembers' notices but have knowingly and intentionally failed to make a diligent effort to repair or remedy the conditions after receiving notice from the Servicemembers.

126.    Moreover, unique to the fact that the Landlord Companies are in the business of leasing to members of the military, obtaining rent payments directly from the federal government and providing housing on a base affiliated with good schools, the Landlord Companies have effectively deprived Servicemembers of potential remedies, including, without limitation, withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing. The the Landlord Companies hold the Servicemembers hostage—and the Landlord Companies know it.

127.    The the Landlord Companies' conduct violates section 92.051 *et seq.* of the Texas Property Code, including section 92.052, and has further deprived Servicemembers of remedies that are statutorily prescribed. The Landlord Companies' conduct further violates the implied warranty of habitability and the implied warranty of good and workmanlike repairs.  As a result, the Servicemembers seek to recover from the Landlord

Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by sections 92.056 and 92.0563 of the Texas Property Code.

### Count 4 – Negligence, Negligent Misrepresentation, and Gross Negligence

128.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies leased homes to Servicemembers with the above-described hazardous and deplorable conditions—but the Landlord Companies never notified the Servicemembers of such conditions.  The the Landlord Companies were aware that the houses had such persistent and toxic defects, as prior tenants had made them aware of the hazards on numerous occasions.  After the Servicemembers moved into their homes and ultimately discovered the issues, they complained repeatedly to the Landlord Companies.  But the Landlord Companiesrefused to act to properly remediate or abate the problems despite knowledge that their failure to act would only exacerbate the problems.  When the Landlord Companies did act, they made only token repairs or permitted only token repairs to be made that did not eradicate the problem, resulting in continuing harm.

129.    The Landlord Companies, as specialized landlords in the business of privatized military housing, owed Servicemembers a duty to notify them of known problems with the housing, provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation. The Landlord Companies' conduct fell far below the applicable standard of care owed to the Servicemembers. The Landlord Companies' breaches of their duty include, without limitation, failing to notify the Servicemembers of known hazardous and deplorable conditions, failing to properly evaluate housing conditions to

ensure leased properties were fit for human habitation and failing to properly repair and remedy those conditions affecting human health and safety.

130.   Moreover, the Landlord Companies, with specialized knowledge regarding the business of military tenancies and the properties leased to Servicemembers, and with a significant pecuniary interest in leasing houses to military families, falsely represented to Servicemembers that their houses were safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the housing units were habitable and the representations were accurate. Servicemembers, who were neither given a meaningful opportunity to inspect the units leased to them, nor provided with the truth regarding the habitability of those units prior to signing leases on them, justifiably relied on the misrepresentations of the Landlord Companies to their detriment.

131.   The Landlord Companies engaged in the above-described acts and/or omissions with gross negligence, such that their acts or omissions, when viewed objectively from the Landlord Companies' standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm. Further, the Landlord Companies at all times had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of the Servicemembers and their families when they knew such acts and/or omissions would clearly and unquestionably result in dangerous health conditions and serious injury to their tenants, as well as destruction of their property. The Landlord Companies' concealment of the persistent and toxic conditions, and then their refusal to remediate the conditions, were among the Landlord Companies' acts and/or omissions which constituted gross negligence.

132.   As a proximate cause of the Landlord Companies' conduct, Servicemembers have incurred and seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and exemplary damages for the Landlord Companies' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

<u>**Count 5 – Statutory Fraud in a Real Estate Transaction**</u>

133.   Pleading further, and in the alternative to the extent necessary, the Servicemembers allege statutory fraud.  Pursuant to section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on by that person in entering into that contract. Furthermore, fraud in a transaction involving real estate consists of a false promise to do an act when it is material, made with the intention of not fulfilling it, made to induce a person to enter into a contract, and relied upon by another in entering into that contract.

134.   The Servicemembers and the Lincoln Housing Defendants clearly entered into leases, which are transactions involving real estate. In the course of those transactions, the Lincoln Housing Defendants represented to Servicemembers that the houses being leased to them were safe for human habitation and that the Lincoln Housing Defendants would perform repair and remedy work to keep the houses habitable throughout the term of the leases. The Lincoln Housing Defendants made these false representations to the Servicemembers fraudulently and/or maliciously so as to induce them to sign leases (including discussing repairs and remedies in documents associated with the Leases) and profit therefrom, and the Servicemembers justifiably relied upon

those representations and promises because of the nature of the association between the military and the Lincoln Housing Defendants, which exclusively control the leasing of on-base housing.

135.    However, because the houses managed and leased by the Lincoln Housing Defendants suffer from pervasive mold and other conditions which have purportedly been "repaired" to no avail for years, it is readily apparent that the Lincoln Housing Defendants were aware that their representations that the houses were fit for human habitation were false and that their litany of promises to perform future repairs and to make the houses habitable were made without any intention of fulfilling those promises.

136.    As a result, the Servicemembers suffered damages. They seek to recover from the Lincoln Housing, Defendants jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code. Servicemembers further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Servicemembers' damages arose from the Lincoln Housing Defendants' fraud and/or malice.

### Count 6 – Common Law Fraud

137.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege common law fraud.  As described herein, the Lincoln Housing Defendants made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of the units. The Lincoln Housing Defendants also made material representations that repair work would be completed and/or had been completed, and that as a result, the units had become habitable and the problems had been resolved. The Lincoln Housing Defendants were aware that all of their omissions of fact concerning the condition of the units were

44

material when they presented Servicemembers with leases, and the Lincoln Housing Defendants — because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting — knew their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, the Lincoln Housing Defendants made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

138.   The Lincoln Housing Defendants intentionally omitted information and made the foregoing misrepresentations with the intent that Servicemembers would rely on them and enter into leases, and, in fact, Servicemembers did rely thereon to their detriment. The Servicemembers' reliance was justified given their lack of an ability to inspect the houses and given the Lincoln Housing Defendants' power over the market. This conduct caused injury to the Servicemembers, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, moving and storage expenses, expenses for replacement of furniture and other items of personal property, and medical expenses in the past and to be incurred in the future.

139.   As a result of the Lincoln Housing Defendants' conduct, the Servicemembers seek to recover from the Lincoln Housing Defendants, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, mental anguish damages, and exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code, as Servicemembers' damages arose from the Lincoln Housing' fraud and/or malice.

## Count 7 – Unjust Enrichment / Restitution / Money Had and Received

140.   Pleading further and, in the alternative to the extent necessary, the Servicemembers allege that, through the transactions described herein, the Landlord Companies were in the business of and were on notice that Servicemembers intended to

lease from them habitable housing on the Military Installation(s). The Landlord Companies, through their conduct in leasing the Servicemembers substandard housing that the Landlord Companies failed to maintain in exchange for the Servicemembers' BAH, have been unjustly enriched and have received money from the Servicemembers that, in equity and good conscience, belongs to the Servicemembers and for which restitution is justly owed.

## Count 8 – Third-Party Beneficiary of Contract

141.   Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies are bound by the Underlying Contracts entered into with The United States of America.[15]  The Underlying Contracts constitute valid and enforceable contracts.

142.   The Servicemembers were intended beneficiaries of the Underlying Contracts including, without limitation, requirements in the applicable ground leases that the Landlord Companies ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential lease development in the local area.

143.   The  the Landlord Companies' obligations which were included in the Underlying Contracts were intended to ensure military personnel such as the Servicemembers named as Plaintiffs in this case (and their families) would be provided with safe and habitable housing while the Landlord Companies operated the housing at issue.   Recognition of the Servicemembers' right to performance is appropriate to effectuate the intention of the Underlying Contracts.   Circumstances indicate that the

---

[15] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

46

parties to the Underlying Contracts, including the Landlord Companies named in this lawsuit, intended to benefit military personnel including the Servicemembers.

144.    The Landlord Companies breached the requirements of the Underlying Contracts by engaging in conduct including, but not limited to, failure to ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the local area.

145.    The Landlord Companies also breached the requirements of the Underlying Contracts by engaging in conduct including but not limited to failing to adhere to federal, state and local lead-based paint regulations as required by the Underlying Contracts, and also by failing to comply with requirements in the Underlying Contracts by engaging in the aforesaid particulars.

146.    The Landlord Companies' conduct also breached the duty of good faith and fair dealing implied in the Underlying Contracts.

147.    As a direct, proximate and foreseeable result of the Landlord Companies' breaches of the Underlying Contracts, the Servicemembers, as intended, direct, third-party beneficiaries of such contracts, sustained damages.  They are entitled to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future.

## Count 9 – Intentional Nuisance

148.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for intentional nuisance.  As described herein, the Landlord Companies refused to act to maintain houses at the Military Installation(s) with the knowledge that their inaction would result

in dangerous living conditions, or that  their inaction was substantially certain to result in dangerous living conditions, thereby interfering   with the Servicemembers' use and enjoyment of their leased homes.

149.    Such interference with the Servicemembers' enjoyment of their homes was substantial,  causing physical damage to their personal property, harm to their health, and   psychological harm to their "peace of mind" in the use and enjoyment of their homes.

150.    The effect  of  such  substantial  interference  in  the  Servicemembers' enjoyment of their   property  was  unreasonable.  The Landlord Companies created conditions  that  resulted  in  offensive  and   intolerable living  environments  that endangered the Servicemembers' health and property.

151.    As a result of said conduct, the Servicemembers seek to recover from and against the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

### Count 10 – Negligent Nuisance

152.    Pleading  further,  and  in  the  alternative  to  the  extent  necessary,  the Servicemembers assert  claims  against  the Landlord Companies for negligent  nuisance. As described herein, the Landlord Companies negligently failed to act when they owed the  Servicemembers   a  duty  as  landlord  and  remediator  to  act,  resulting  in  an unreasonable interference with the Servicemembers'  enjoyment of their homes.

153.    The Landlord Companies failed  to take precautions against the risk that dangerous  living   conditions  would  result  from  their  inaction  or  substandard  action when they had the ability   to control the repairs on the houses and abate such dangers.

154.     As a result of such conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## Count 11 – Strict Liability Nuisance

155.     Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for strict liability nuisance.  As described herein, the Landlord Companies' conduct violates sections 341.011 and 343.011 of the Texas Health and Safety Code.

156.     For example, under section 341.011, the following are statutory public health nuisances:  "sewage, human excreta, wastewater, garbage, or other organic wastes deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons," "a collection of water that is a breeding area for mosquitoes that can transmit diseases," "a place or condition harboring rats in a populous area,"  and "an object, place, or condition that is a possible and probable medium of disease transmission to or between humans." *See* TEX. HEALTH & SAFETY CODE §§ 341.011(5), (7), (9), and (12).

157.     Despite being notified of such conditions, the Landlord Companies' failure to act has resulted in the above-described statutory violations. A person who causes, suffers, allows, or permits a violation under section 341.011 "shall be assessed a civil penalty of not less than $50 and not more than $5,000 for each violation.

158.     Under section 343.011, "a person may not cause, permit, or allow a public nuisance," which the statute defines as, among other things, "maintaining premises in a manner that creates an unsanitary condition likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests" and "maintaining a building in a

manner that is structurally unsafe or constitutes a  hazard to safety, health, or public welfare." *See* TEX. HEALTH & SAFETY CODE §§ 343.011(b), (c)(3), (c)(5).

159.    As a result of the Landlord Companies' conduct,  Plaintiffs seek to recover from the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## ACCRUAL OF CLAIMS/DISCOVERY OF INJURIES

160.    Each of the Servicemembers began suffering injuries within the limitations period for all of the claims asserted herein. Specifically, they all began suffering medical conditions and suffered property damage at points in time after they moved into their applicable military housing units.

161.    Further, pleading in the alternative to the extent necessary, all Servicemembers are entitled to tolling of their claims on account of the Landlord Companies' fraudulent concealment. The Servicemembers had to rely on the Landlord Companies to perform maintenance and repairs. After each repair, the Servicemembers reasonably believed (in reliance upon the Landlord Companies' assurances) that the problems were remedied, or that there were no problems at all, when in reality the Landlord Companies had just hidden the problems. Only later did many of the Servicemembers discover that the Landlord Companies' so-called "repairs" were nothing but band-aid measures and that their health and/or property were imperiled.

162.    Further, pleading in the alternative to the extent necessary, the discovery rule tolls Servicemembers' claims. *See, e.g.*, Tex. Bus. & Com. Code § 17.565. All Servicemembers discovered the extent and true nature of their personal property damage only upon moving out. Additionally, under Texas law the discovery rule tolls mold-related personal injury claims until after onset of mold-related illness and until the plaintiff discovers the extent of mold and causally links it to ill health, which for all

Servicemembers occurred well within the limitations period. Thus, accrual of Servicemembers' claims occurred, at earliest, only after: (1) discovery of extent of the mold; (2) symptomatic manifestation of ill health; and (3) discovery of a causal connection between (1) and (2).

### CONDITIONS PRECEDENT

163.    All conditions precedent to the Servicemembers' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been provided or were waived, excused, or otherwise satisfied.

### ATTORNEY'S FEES & COSTS

164.    Pursuant to all applicable statutory provisions pled herein, including without limitation section 38.001 of the Texas Civil Practice and Remedies Code, section 27.01 of the Texas Business and Commerce Code, chapter 92 of the Texas Property Code, section 17.50(d) of the Texas Business and Commerce Code, and as otherwise allowed at law and/or in equity, the Servicemembers are entitled to recover from the Landlord Companies all of their reasonable and necessary attorneys' fees and expenses incurred in connection with this lawsuit. The Servicemembers are also entitled to recover from the Landlord Companies all costs of court.

### EXEMPLARY DAMAGES

165.    Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by the Servicemembers resulted from the fraud, malice, and/or gross negligence of the Landlord Companies, the Servicemembers are entitled to and seek the recovery of exemplary damages from the Landlord Companies.

### JOINT LIABILITY

166.    The Landlord Companies s are jointly and severally liable to the Servicemembers on all causes of action asserted herein for a multitude of reasons.

167.    First, the Landlord Companies had a meeting of the minds and embarked on a systematic attempt to defraud Servicemembers by making false representations and promises to Servicemembers in order to induce them to lease, without any legitimate expectation that they would provide Servicemembers with a habitable home as promised. The Landlord Companies engaged in one or more unlawful, overt acts to accomplish the actions complained of herein. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

168.    Second, the Landlord Companies are part of a joint enterprise or single business enterprise associated with the rental of houses at military installations in Texas and are not individually distinguishable. All the  Landlord Companies carried on business as a mutual undertaking with a common business or pecuniary purpose and using the same common name, which is featured prominently on Servicemembers' leases and on websites designed for communication between Servicemembers and the Landlord Companies.  The Landlord Companies had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise. Therefore, all the Landlord Companies were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

169.    Third,  the Landlord Companies intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another. Specifically, in all or nearly all email communications between Servicemembers and the Lincoln Housing Defendants, the parties communicating on behalf of the Landlord Companies have signature blocks, among other indications, clearly stated that they were being transmitted by as part of an

affiliation/agency with each other. As a result, all the Landlord Companies acted as the agent of the others in the course of the conduct described herein. Therefore, all the Landlord Companies are jointly and severally liable as principals/agents for the claims asserted against each of them.

170.    Fourth,  the Landlord Companies committed the acts complained of herein on behalf of one another and ratified the same. Each of the Landlord Companies approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Servicemembers. This approval was given with the intention of giving validity to the acts. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

171.    Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All the Landlord Companies aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Servicemembers and to breach their duties as set forth herein. Each of the Landlord Companies did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

172.    Finally, based on public statements, the Servicemembers understand and believe that the Hunt Housing Defendants assumed the contracts, leases, obligations, and liabilities of the Lincoln Housing Defendants, making the Hunt Housing Defendants equally liable with the Lincoln Housing Defendants.

## <u>JURY DEMAND</u>

173.    Plaintiffs demand a trial by jury and tender the jury fee.

## PRAYER

WHEREFORE, premises considered, the Plaintiffs named herein pray that the Court grant them judgment against the Defendants named herein, jointly and severally, on all claims and for all relief sought herein, including but not limited to, judgment for:

a) Actual damages in the past and future;

b) Economic damages;

c) Mental anguish damages;

d) Statutory damages;

e) Treble damages, including treble economic and treble mental anguish damages under the DTPA;

f) Exemplary damages, as pled for herein;

g) Reasonable and necessary attorneys' fees and costs of court;

h) Pre-judgment interest at the highest rate allowed by law;

i) Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

j) All writs necessary to effectuate the judgment; and

k) Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.


Dated: January 7, 2022                    Respectfully submitted,

**WATTS GUERRA LLP**

By: */s/ Mikal C. Watts*
     Mikal C. Watts
     Texas State Bar No. 20981820
     mcwatts@wattsguerra.com
     Francisco Guerra, IV.
     fguerra@wattsguerra.com
     Texas State Bar No. 00796684
     Robert Brzezinski
     Texas State Bar No. 00783746
     rbrzezinski@wattsguerra.com
     Jennifer Neal

54

Texas State Bar No. 24089834
jneal@wattsguerra.com
Alexis R. Garcia
Texas State Bar No. 24117204
4 Dominion Dr.
Bldg. 3, Suite 100
San Antonio, TX 78257
(210) 447-0500 Telephone
(210) 447-0501 Facsimile

**PULMAN, CAPPUCCIO & PULLEN, LLP**
Randall A. Pullman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Ryan C. Reed
Texas State Bar No. 24065957
rreed@pulmanlaw.com
Matthew J. McGowan
Texas State Bar No. 24098077
mmcgowan@pulmanlaw.com
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**MORIARTY SKIVER**
James. R. Moriarty
Texas State Bar No. 14459000
jim@moriarty.com
4119 Montrose, Suite 250
Houston, Texas 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile

*Attorneys for Servicemember Plaintiffs*